**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

CATHERINE A. BOSEN,

     Plaintiff,

vs.                          CASE NO. 8:11-CV-2198-T-EAK-EAJ

MANATEE COUNTY SCHOOL BOARD,
and THOMAS L. LEVENGOOD,

     Defendants.

                                     /

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

The cause is before the Court on Defendant, Manatee County School Board's (School Board), motion for summary judgment and attachments (Docs. 18-22); Defendant, Thomas L. Levengood's (Leavengood), motion for summary judgment and attachments (Docs. 23 and 19-22), statement of undisputed facts (Doc. 24); and response thereto with attachments (Docs. 28-29).

## STANDARD OF REVIEW

This circuit clearly holds that summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the nonmoving party. *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983). All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Hayden v. First*

*National Bank of Mt. Pleasant*, 595 F.2d 994, 996-7 (5th Cir. 1979) (quoting *Gross v. Southern*

*Railroad Co.*, 414 F.2d 292 (5th Cir. 1969)).  Factual disputes preclude summary judgment.

The Supreme Court of the United States held, in *Celotex Corp. v. Catrett*, 477 U.S. 317,

91 L.Ed.2d 265, 106 S.Ct. 2548, (1986):

> In our view the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a party who
> fails to establish the existence of an element essential to that party's case, and on
> which that party will bear the burden of proof at trial.  Id. at 273.

The Court also said, "Rule 56(e) therefore requires that nonmoving party to go beyond

the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and

admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'"  *Celotex*

*Corp.*, at p. 274.  As the district court in *Coghlan v. H.J. Heinz Co.*, 851 F.Supp. 808 (N.D. Tex.

1994), summarized:

> Although a court must "review the facts drawing all inferences most favorable to the
> party opposing the motion,"...the nonmovant may not rest on mere allegations or denials
> in its pleadings; in short, "the adverse party's response... must set forth specific facts
> showing that there is a genuine issue for trial."  FED.R.CIV.P. 56(e).  However, merely
> colorable evidence or evidence not significantly probative will not defeat a properly
> supported summary judgment...The existence of a mere scintilla of evidence will not
> suffice...(cites omitted) at 810-811.

The Court must "draw inferences from the evidence in the light most favorable to the non-

movant and resolve all <u>reasonable</u> doubts in that party's favor." *Speciality Malls of Tampa v. The*

*City of Tampa*, 916 F.Supp 1222 (Fla. M.D. 1996) (emphasis added).  A court is not required to

allow a case to go to trial "when the inferences that are drawn from the evidence, and upon

which the non-movant relies are 'implausible.'"  *Mize v. Jefferson City Board of Education*, 93

2

F.3d 739, 743 (11th Cir. 1996).

A court, however,  may only consider "that evidence which can be reduced to an admissible form," *Rowell v. BellSouth Corp*., 433 F.3d 794, 799 (11th Cir. 2005).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.*  In considering the evidence, the court resolves all reasonable doubts about the facts in favor of the non-moving party and draws all justifiable inferences in its favor.  *Hickson Corp. v. Northern Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  The court does not, however, weigh the evidence or make findings of fact.  *Anderson*, 477 U.S. at 249-50.

In an employment discrimination case, the court must grant the motion for summary judgment if the plaintiff has failed to carry his burden of proof by offering evidence that is "merely colorable, or is not significantly probative."  *Earley v. Champion International Corp*., 907 F.2d 1077, 1080 (11th Cir. 1990).  The plaintiff cannot rely on suspicion or conjecture to prove an adverse employment action was motivated by discrimination.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986).  The party opposing a motion for summary judgment cannot meet his burden by making general assertions or legal conclusions.  "Neither frivolous assertions nor unsupported statements nor illusory issues nor mere suspicions will suffice to justify a denial of summary judgment.  **The court may disregard evidence that is too incredible to be believed.**  The evidence offered by the opposing party must be admissible at trial and must have the force needed to allow a jury to rely on it.  "*Hales v. First Applachian Corp*., 494 F.Supp.

3

330, 333 (N.D. Ala. 1980) (emphasis added).


## BACKGROUND AND FACTS

The Plaintiff filed a complaint in the Circuit Court of the Twelfth Judicial Circuit, Manatee County and that complaint was removed by the Defendants to this Court.  The complaint set forth the following counts: Count I-Age Discrimination in Employment, pursuant to the Age Discrimination in Employment Act (ADEA) 29 § 621, *et seq.*, against the School Board; Count II-Age Discrimination pursuant to Chapter 760, Florida Statutes, the Florida Civil Rights Act (FCRA), against the School Board; Count III-Age Discrimination in Employment Act for retaliation against the School Board; Count IV-Florida Civil Rights Act for retaliation against the School Board; and Count V-defamation against the School Board and Levengood.

The parties, after conferring, agreed that the following are undisputed facts.  These facts are set out in Docket 24 (the Court also indicates where these facts are supported in the submitted record) as follows:

1.  In 2003, the Plaintiff was employed by the School Board as a kindergarten teacher at Anna Maria Elementary (Anna Maria). (Doc. 19, pg. 60).

2.  In January 2007, Levengood, former principal of Bay Shore Elementary, became the principal at Anna Maria. (Doc. 19, pg. 60).


3.  At the end of the 2006-2007, Levengood e-mailed the Plaintiff, stating that teachers were expected "to leave their rooms in a condition that was ready for the custodians to give it a

4

thorough cleaning." The Plaintiff failed to properly clean her classroom. The letter read in part:

> There is not one clean surface on any desk or table. Your teacher desk is still stacked so high that if it were moved to shampoo the carpets it would take many plastic tubs to pick up what falls off. Children's literature books are strewn on the floor. Glue bottles are still out on desks. Student scissors are on chairs and the floor. Filled juice pouches are on the desks and the floor. What appears to be completed student work and projects cover the kidney table. Paint cans are stacked on the counter. Blankets are piled on student desk tops and on the floor right where the students left them on their last day. Unfortunately, that is only a partial description of your classroom...
>
> ...I was very disappointed to learn when I spoke with Shirley ...this isn't a one time oversight. (Doc. 21-2).

4. For the 2007-2008 school year, there were three kindergarten classes at Anna Maria which were taught by Maureen Loveland (Loveland), Melanie Moran (Moran), and the Plaintiff. Both Loveland and Moran taught at Anna Maria "far longer than" the Plaintiff and both had more seniority. The three teachers were "about the same age." (Doc. 19, pgs. 67-68, 79, 81).

5. Anna Maria experienced a decrease in student enrollment at the start of the 2007-2008 school year. Due to this decrease, Levengood needed to eliminate a kindergarten class and, since Plaintiff had the least seniority, Levengood decided to eliminate her class and redistribute the students to the other classes.

6. Levengood offered the Plaintiff the opportunity to teach second grade, after the transfer of a second grade teacher to another school, and she accepted.

7. Levengood and Darcy Hopko (Hopko), Director of Human Resources, met with the Plaintiff October 15, 2007, to "address the various complaints Levengood had received from parents regarding BOSEN's second grade class," but it was postponed until November 6, 2007, due to a personal issue of Plaintiff. (Docs. 21-3 through 21-7).

8. At the time of the meeting, Levengood addressed each parents' concerns with Plaintiff

and went over his expectations for her classroom. They memorialized the expectations in a memorandum of conference. (Doc. 21-8).

9. During a meeting with the Plaintiff on November 9, 2007, Plaintiff and Levengood drafted a letter to her student's parents, signed by both, which was sent to the parents "as a guideline for what they should expect from BOSEN on a weekly basis." (Doc. 21-9).

10. On December 11, 2007, the Plaintiff was formally returned to the documentation program and the areas of concern which required this return included: planning, management and statistics, presentation of subject matter, verbal and non-verbal communications, test preparation and feedback, and employability.

11. The Plaintiff was placed on performance probation, pursuant to Section 1012.34(3)(d), Fla. Stat, by letter of February 25, 2008, stating that she was not performing her teaching duties in a satisfactory manner. (Docs. 21-13 and 21-18).

12. A written reprimand was issued to the Plaintiff on May 19, 2008, (Doc. 21-19). The letter refers to the following as the bases for the reprimand: 1) allowing a parent to take pictures of the Plaintiff's students holding textile products to advertise the products for sale on the parent's internet website and 2) leaving her class unattended outside the building while the Plaintiff went to her truck to get building keys.

13. Levengood sent Dr. Dearing, the then Superintendent of Manatee County Schools, a letter of May 27, 2008, informing him that the Plaintiff had not satisfactorily corrected her performance deficiencies. (Doc. 21-20). The letter of May 27th, outlined the same issues that were addressed in the May 19, 2008 reprimand but with additional issues outlined. The additional issues included: I) not filling out school forms or not filling them out correctly; ii)

classroom disorganization; iii) failure to consistently contact parents with student behavior issues; iv) haphazard teaching; v) developmentally inappropriate lessons; vi) playing catch up to the other second grades by assigning large amounts of workbook pages with little teacher instruction; and vii) many other deficiencies as to assessment, communication, employability skills and other areas.  The letter concludes: "It is my recommendation that Ms. BOSEN be terminated.  It is my further recommendation that she be placed on administrative leave with pay effective immediately.  There is a strong concern that her students' academic achievement and safety is at risk and further exposure to unsatisfactory instruction and supervision will adversely affect these 2nd grade students."

14.  On May 29, 2008, the Superintendent placed the Plaintiff on paid administrative leave effective May 30, 2008, pending the decision of the School Board on his recommendation for termination.  (Doc. 19, pg. 191, Doc. 21-21).

15.  Plaintiff submitted her letter of resignation on June 4, 2008.  (Doc. 21-22).

16.  On August 12, 2008, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC).  Prior to that charge, the Plaintiff "never made any allegations that she was being discriminated against based on a protected characteristic." (Doc. 19, pgs. 211-213).

The Court has reviewed the record in this case and sets forth the following as allegations made in the Plaintiff's deposition.

17. Plaintiff commenced her employment with the Defendant School Board in October 2002 as a literacy coach coordinator, she coached teachers who observed her working with

students.  (Doc. 19, pgs. 57-58).

18.   In 2007, at the time Mr. Levengood came to Anna Maria as principal, the Plaintiff was teaching kindergarten with a class of eighteen students.  (Doc. 19, pg. 67).

19.   The School Board employed two types of teachers, annual contract teachers and professional services contract teachers, and the two types of employees were evaluated differently.  (Doc. 19, pg. 70).  One of the evaluations was a "walk-through" and the other was an evaluation or observation, which include a preconference and a post-evaluative.  The Plaintiff had the evaluation method prior to Mr. Levengood but he only did the "walk-through" until she was returned to a 90-day probationary period and documentation.  (Doc. 19, pgs. 71-72).

20.   The Plaintiff did not remember any incidents or comments from her first principal at Anna Maria, Ms. Hayes, about parents concerned about her performance or classroom.  (Doc. 19, pg. 77).

21.   In or around the time her kindergarten class was eliminated, Plaintiff said that Mr. Levengood told her "Parents don't like you, and you should, you know, go to another school." (Doc. 19, pg. 81).   In fact, the Plaintiff believed or knew that some of the parents were complaining about her to other parents and probably to Mr. Levengood.  (Doc. 19, pgs. 100-104).   22.  It was the Plaintiff's recollection that Mr. Levengood told her he did not think she could handle the second grade class but she kept telling him she could handle it and she did, in fact, take over the second grade class.  (Doc. 19, pgs. 91-92).

23.   During the transition to second grade, the Plaintiff had some issue with a couple of mothers of her students who apparently came into her classroom too often in her opinion and

who threw too elaborate parties for occasions like Halloween and Valentine's Day. The Plaintiff

told the guidance counselor, Mrs. Harrison, and Mr. Levengood, or perhaps she told Mrs.

Harrison and asked her to tell Mr. Levengood. (Doc. 19, pgs. 94-99).

24.  The teacher who left the second grade class which the Plaintiff took over was around

40 years old.  (Doc. 19, pg. 90).

25.  In regard to the letter concerning the state of her classroom at the end of the 2006-

2007 school year, the Plaintiff admitted she was wrong but she left because her mother had a

medical situation she considered serious.  She did come back from her mother's and cleaned the

room.  (Doc. 19, pg. 108).

26.  The Plaintiff stated, but submitted no proof except her conclusory statements, that

parents were being coached to complain about her and that the "joke" was that if you wanted to

complain about Katie, the Plaintiff, you could always get in to meet with Mr. Levengood.  (Doc.

19, pg. 123-125).

27.  In her deposition, the Plaintiff denied the following: a) not covering the same

materials as the other second grade classes in a reasonable time; b) discussing children's

shortcomings in front of other students or parents; c) failing to complete her grade book (stating

that she was using a physical grade book and not entering the grades electronically like the other

teachers; and d) allowing two students to wander away toward the water (the school is on a bay)

without supervision.  (Doc. 19, pgs. 137-143 and 169).

28.  There were several packets of correspondence from a relative of a child in the

Plaintiff's class to Mr. Levengood about the child's experiences in the class.  The letters

included an accusation that the Plaintiff grabbed the chair of the child while he sat in it and

shook the chair with him on it (this complaint was made a week after the Plaintiff was put on the

professional development plan).  (Docs. 21-10 and 20; Doc. 19, pg. 163).  Also, there was a

report that a child said that the Plaintiff, when she got mad, grabbed children hard and yanked

them around to force them roughly to their seats. (Doc. 21-11).  At least one letter asked for the

child to be transferred to another class. (Doc. 21-12).

     29.   The Plaintiff did allege that someone, the parents of the children in her class or Mr.

Levengood, hired a teacher to tutor the children to "interrogate" to determine if the Plaintiff was

a good teacher.  It appears that a tutor was hired for one of her students and the Plaintiff thinks it

was to prove she was not a good teacher.  (Doc. 19, pgs. 146-151).

     30.   Following her placement on the professional developmental plan, Mr. Levengood, on

two occasions, came to her classroom to formally observe and evaluate the Plaintiff's

performance.  (Doc. 19, pgs. 163).

     31.   The Holmes Beach Police and a Child Protective Services' investigator were in Mr.

Levengood's office right before the school's winter break to investigate a "charge" and the

Plaintiff was told to wait.  The Plaintiff was outside the office waiting and heard what was said

and she knew it was about her but not exactly what the charge was.  She did hear Mr. Levengood

say that she left students unattended.  She left after an hour to go to Tampa to catch a plane and

she did not speak to the police or the investigator at that time.  (Doc. 19, pgs. 163-170).  The

Plaintiff did speak to CPS after the holidays in regard to a complaint about her shaking a child.

(Doc. 19, pgs. 187-188).

     32.   After the Winter break, the Plaintiff wrote to Mr. Shapiro, who appears to be an

attorney with the County, with a myriad of allegations, accusations, and statements.  The letter

doesn't clearly ask Mr. Shapiro for specific assistance, but generally just outlines her complaints

and conclusions about the school, the students, and the parents.  (Doc. 21-14).

33.  At some point, the School Board's Office of Professional Standards did an internal

investigation as to the accusation that Plaintiff shook a child in his chair.  The report, dated June

5, 2008, states that CPS and Holmes Beach Police Department closed their cases as

"unfounded." The disposition of section of the report says: "The recommended disposition for

this matter is held in abeyance pending the outcome of the recommendation by the

Superintendent to terminate Bosen's employment."  Then it notes that Ms. Bosen resigned

effective June 6, 2008.  (Doc. 21-17).

34.  The Plaintiff also said she knew for sure that Mr. Levengood told parents of her

students that she was going to be fired before she resigned.  She knew this because a Stephanie

F. told her that he had given out that information. Further, Mr. Levengood told her, right before

Winter break, that she was to be terminated and she would not be back.  (Doc. 19, pgs. 130-133).

35.  The Plaintiff admitted that she never made any allegations or complaints to the

administration of Anna Maria or the School Board that she was being discriminated against.  She

complained maybe to parents or other teachers but not to anyone with authority.  (Doc. 19, pgs.

211-213).

36.  There other teachers who continued to teach at Anna Maria after she resigned who

were older than the Plaintiff, there was one who was 72, one who was 70, and a third but the

11

Plaintiff failed to identify her age. (Doc. 19, pgs. 213-215).   The Plaintiff did file an Equal

Employment Opportunity Commission (EEOC) complaint on August 12, 2008, for age

discrimination and retaliation. (Doc. 21-23).

   37. Plaintiff states that she was told by people at the 13th Avenue Community Center

(the community center): "You won't get a job around here [Manatee County] because of what he

[Levengood] said.  There's no way." (Doc. 19, pgs. 22 and 29).  She identified Bill Buckley, the

president of the Sarasota Rotary and accountant for the community center, and Meg Walsh,

director of the community center, as some of the people who told her this information. (Doc. 19,

pg 29).  The Plaintiff did, in fact, work for the community center teaching kindergarten to fourth

grade children for a month, three hours a day, after she left the employment of the Defendant

Manatee County but she applied for the job of director which she did not get and she attributed

that failure to Mr. Levengood.  (Doc. 19, pgs. 32-33).

   38. Plaintiff claims that Mr. Buckley and Jack Hunkele, the philanthropist who funded

the community center, offered her the position of community center director, replacing Meg

Walsh, and she organized the center for them.  (Doc. 19, pg. 37).  She was supposed to start in

August 2008.  (Doc. 19, pg. 43).

   39. Plaintiff named several people who told her that they were told, either directly by

Mr. Buckley or by someone who heard from Mr. Buckley, that Mr. Buckley was telling people

she was dragged from the campus, fired on the spot. (Doc. 19, pg. 47).


   In addition to her deposition, the Plaintiff submitted affidavits from three individuals.

The first, Lynne Montgomery Rubino, a sale representative for an education and trade publisher

who knew the Plaintiff from meeting her when she was in the process of selling Leveled Literacy

Readers.  The affiant extolled the Plaintiff for using the appropriate "textbooks, techniques, and

materials;" the materials the affiant sold.  In fact, the majority of Ms. Rubino's affidavit

explained the products she sold in general terms, not as specifically applied by the Plaintiff.  In

regard to the Plaintiff, the affiant did praise her and stated that on her visits to the Plaintiff's

classroom it was a "wonder to behold."

The second affidavit was from Margaret Walsh, the former interim director of the

Neighborhood Learning Center in Manatee County (also identified as the community center in

this order).  The affiant observed the Plaintiff's kindergarten classroom once weekly for a year or

more in order to adopt or adapt the Plaintiff's strategies, materials and activities to the

community center.  Ms. Walsh stated that, while the Plaintiff was with the School Board, she

was offered the position as Director of the center (though she does not state how she was aware

of this offer), but the Plaintiff stayed with the School Board and took on some consulting role at

the center.  The affidavit praises the Plaintiff and concludes that Mr. Levengood "had it in for"

the Plaintiff.  Nothing in the affidavit is supported by facts other than the affiant's opinion and

outright conclusions.  Several of the statements doubtfully were made from personal knowledge,

i.e. "filed a false police report."

The last affidavit was filed by Kathleen Rose Moran, a retired bookkeeper and apartment

complex owner.  She met the Plaintiff when she observed her kindergarten class and then

volunteered in the Plaintiff's second grade classroom.  The affiant praised the Plaintiff and

"vouch[ed] that her training with years of study to obtain her M.S.Ed. have been dedicated to the

love educating young children...What she accomplished in those few years was most

extraordinary."

The last evidence present to this Court to consider in resolution of the pending motion for summary judgment is that of Thomas L. Levengood. Mr. Levengood's affidavit includes explanations of the transfer of the Plaintiff to a second grade class; the placement of the Plaintiff on a documentation program; and the written reprimand of May 19, 2008. These explanations track the undisputed facts previously set out in Paragraphs 5 through 13, of the fact section of this order.

The affidavit also sets out information about the incident of the police report, saying that Mr. Levengood received an complaint form the grandparent of a student in Plaintiff's class that Plaintiff had "physically and mentally abused her grandson...shook her grandson's chair." As required under Florida law, the affiant contacted Child Protective Services. When he took the Plaintiff to his office to see the police and investigator he told her to "say good bye to her students because she would not be returning before they left for winter break." Plaintiff left the school without talking to the police and investigator which violated Mr. Levengood's instruction to the Plaintiff.

## **DISCUSSION**

I. Motion for Summary Judgment of Thomas L. Levengood

The only claim made against Mr. Levengood by the Plaintiff is for defamation.    The

Court finds that the Plaintiff has in no way established that there are material issues of fact to be

determined on this claim.  In order to establish defamation, a movant must satisfy five elements:

> (1) publication to a third party; (2) a false statement; (3) fault, amounting to at least
> negligence, in the making of the publication; (4) actual damages; and (5) a defamatory
> statement.

*Signature Pharmacy, Inc. v. Soares*, 717 F.Supp.2d 1276, 1296 (M.D.Fla.,2010) (citing  *Jews*

*For Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla.2008);  *Thomas v. Jacksonville Television,*

*Inc.*, 699 So.2d 800, 803 (Fla. 1st DCA 1997)) (citations and quotations omitted).  The Court

finds the Defendant's motion persuasive on this claim.  The only so called evidence the Plaintiff

has presented is so far from competent that it would not be allowed in at trial and as the Court

has already pointed out:

> Neither frivolous assertions nor unsupported statements nor illusory issues nor mere
> suspicions will suffice to justify a denial of summary judgment.  **The court may
> disregard evidence that is too incredible to be believed.**  The evidence offered by the
> opposing party must be admissible at trial and must have the force needed to allow a jury
> to rely on it."  *Hales v. First Applachian Corp*., 494 F.Supp. 330, 333 (Ala. N.D. 1980).

The Plaintiff relies purely on hearsay testimony that some person or another told her they heard

that Mr. Levengood made defamatory statements to someone else about her in regard to losing

her opportunity for a job at the Learning Center. A court decides as a matter of law if the words

are actionable or "non-actionable expressions fo pure opinion and/or rhetorical hyperbole."

*Fortson v Colangelo,* 434 F.Supp. 2d 1369, 1379 (S.D. Fla. 2006).

Here the Court agrees with the analysis of the Defendant in his motion for summary

judgment.  In fact, the Plaintiff fails to even make a supported argument for denial of the motion

for summary judgment, not citing even one case in support of her claim for defamation.   In fact,

the Plaintiff does not cite one case in her entire response to the motion for summary judgment;

which response is six pages long and simply sets out the "facts" as seen by the Plaintiff, many of

which constitute no more than conclusory statements.  The response was particularly unhelpful

to this Court.

The motion for summary judgment (Doc. 23) will be granted and Mr. Thomas L.

Levengood will be dismissed from this case.

II.  Motion for Summary Judgment of the School Board of Manatee County

The Plaintiff has also brought a defamation count against the School Board.  The

discussion as to Mr. Levengood is equally applicable to the School Board.  Summary judgment

is granted as to the defamation count against the School Board.

The next issue is whether or not the Plaintiff can prevail under the ADEA and FCRA to

defeat the motion for summary judgment (Counts I and II).  The criteria to address here is:

> A claim of unlawful age discrimination under the ADEA may be established through
> direct or circumstantial evidence. See *Van Voorhis v. Hillsborough Cnty. Bd. of Cnty.
> Comm'rs*, 512 F.3d 1296, 1300 (11th Cir.2008). When such a claim is based on
> circumstantial evidence, we analyze the allocation of burdens and the presentation of
> proof under the framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S.
> 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See *Chapman*, 229 F.3d at 1024 (applying
> McDonnell Douglas to evaluate ADEA claims); *Mauter v. Hardy Corp.*, 825 F.2d 1554,
> 1556 (11th Cir.1987) (same).

> Under McDonnell Douglas, a plaintiff must first establish a prima facie case of
> discrimination, which "in effect creates a presumption that the employer unlawfully
> discriminated against the employee." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S.
> 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To make out a prima facie case of age
> discrimination, the plaintiff must show four things: "(1) that she was a member of the
> protected group of persons between the ages of forty and seventy; (2) that she was
> subject to adverse employment action; (3) that a substantially younger person filled the
> position that she sought or from which she was discharged; and (4) that she was qualified
> to do the job for which she was rejected." *Damon v. Fleming Supermarkets of Fla., Inc.*,

196 F.3d 1354, 1359 (11th Cir.1999).

Once the plaintiff establishes a prima facie case of age discrimination, the burden shifts to the employer to rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for the adverse employment action. See *McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. 1817. "This burden is one of production, not persuasion ...." *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097. Thus, "[t]o satisfy that burden of production, '[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.' " *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997) (quoting *Burdine*, 450 U.S. at 254–55, 101 S.Ct. 1089). If the employer produces evidence of a legitimate, nondiscriminatory reason for the adverse action, the plaintiff is afforded an opportunity to show that the employer's stated reason is a pretext for discrimination. See, e.g., *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817.

*Kragor v. Takeda Pharmaceuticals America, Inc.*, 702 F.3d 1304, 1308 (C.A.11 2012).

There is no direct evidence here, evidence that only suggests discrimination is not direct evidence. *Merritt v. Dillard Paper Co.,* 120 F. 3d 1181, 1189 (11th Cir. 1997). Therefore, the Court must then engage in the burden-shifting analysis as set out in the relevant case law. The Court looks first to the *prima facie* test and finds that the Plaintiff has established that she was a member of the protected group (this is not disputed); that she was subjected to an adverse employment action (she was discharged); and that a substantially younger person filled her position (this is not really proven in the facts presented but it does seem to be undisputed). As the Defendant School Board does not directly address this issue, the Court will find that the first step has been met, the Plaintiff has met her first burden.

The burden next shifts to the question of whether or not the employer produces a legitimate, nondiscriminatory reason for terminating the Plaintiff. The Court finds this burden has easily been met. The record is replete with legitimate reasons for terminating the Plaintiff,

17

such as the failure of the Plaintiff in: i) not filling out school forms or not filling them out

correctly; ii) classroom disorganization; iii) failure to consistently contact parents with student

behavior issues; iv) haphazard teaching; v) developmentally inappropriate lessons; vi) playing

catch up to the other second grades by assigning large amounts of workbook pages with little

teacher instruction; vii) allowing a parent to take pictures of the Plaintiff's students holding

textile products to advertise the products for sale on the parent's internet website, viii) leaving

her class unattended outside the building while the Plaintiff went to her truck to get building

keys, and ix) other deficiencies as to assessment, communication, employability skills and other

areas.  (Docs. 21-19 and 21-20).  The Plaintiff fails to bring forth competent evidence to counter

these allegations.

Therefore, the final question is whether the Plaintiff came back and established that the

legitimate reasons articulated are pretextual.  At this step the Plaintiff's burden is to come

forward with "significant probative evidence of pretext, not mere conclusory allegations.

Further, the focus is on the employer's beliefs rather than the employee's own perceptions."

*Little v Foster Wheeler Constructors, Inc.,* 2010 WL 2035546, *6 (S.D. Fld. 1010) (citing

*Lockett v. Choice Hotels Int'l, Inc.,* 315 Fed. Appx. 862, 868–69 (11th Cir. 2009)) (internal

citations and quotations omitted).

The Plaintiff has sorely missed the mark on this issue.  There is no probative evidence

presented by the Plaintiff, just her conclusions, and those of the affiants she submits, that the

Plaintiff was doing an excellent job and the only possible motivation for her termination was

perhaps her age.  In fact, her affiants do not even maintain she was let go because of her age, just that Mr. Levengood, in their opinions, were out to get the Plaintiff.  That is not significant probative evidence and cannot defeat the motion.  The Court finds the Defendant's motion persuasive on this issue and the motion for summary judgment will be granted.

The final issue is that of the retaliation counts (Counts III and IV).  The Court can merely inquire, retaliation for what?  The Plaintiff admitted that at no time prior to her termination, and in fact not until the filing of the EEOC complaint, did she make any complaints or allegations to the School Board or any part of the School Board or administration at Anna Maria concerning discrimination.  So there are no material facts as to the causal relationship between her "protected" activity, which took place months after her termination, and the termination.  If the retaliation counts were based on the alleged "negative references" to prospective employers, again the protected activity took place after the references were alleged to have occurred.  The motion for summary judgment on retaliation must be granted also.  Accordingly, it is

**ORDERED** that the motion for summary judgment be **granted** as to all counts as to both the School Board and Mr. Levengood.  The Clerk of Court is **directed** to enter judgment for the Defendants and against the Plaintiff and to close this case and terminate any pending motions.

**DONE and ORDERED** in Chambers, in Tampa, Florida, this 28th day of March, 2013.



ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies to:
All parties and counsel of record